**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

<u>Alan F. Beane and
Mii Technologies, LLC</u>
Plaintiff and Nominal Plaintiff

    v.

<u>Glenn Beane and
Glenn Beane, LLC</u>
Defendants and Third Party Plaintiffs

    v.                          Civil No. 06-cv-446-SM

<u>Alan F. Beane,
Mii Technologies, LLC
and Sara Beane</u>,
Counterdefendants and
Third Party Defendant


**O R D E R**

      Defendants and third party plaintiffs Glenn Beane and Glenn

Beane, LLC ("Glenn Beane") have petitioned the court to attach

certain assets of plaintiff Alan F. Beane ("Alan Beane") and

nominal plaintiff Mii Technologies, LLC ("Mii"), to secure

payment of the anticipated, favorable judgment on Count IV of

their counterclaims.  That count asserts Glenn Beane's right to

reimbursement of payments made and expenses incurred on behalf of

plaintiffs.  An evidentiary hearing on the petition to attach was

held on September 26, 2007.  For the reasons set forth below,

Glenn Beane's petition to attach (document no. 33) is granted in part and denied in part.

Background[1]

Alan Beane and Glenn Beane are brothers who combined talents in an entrepreneurial endeavor to develop heat sinks and related applications of metal castings for manufacturing processes and powder press systems. Alan Beane contributed financially, both investing capital of several million dollars to fund the business and personally guaranteeing loans obtained to finance its operations[2]. Glenn Beane contributed creatively, developing patented inventions and serving as the president and chief

---

[1]The background facts of this action are more involved than is necessary to consider to resolve the matter currently before the court. Accordingly, only those facts relevant to the analysis of the requested petition to attach are discussed.

[2]The financing Alan Beane provided was from personal assets, some of which were jointly owned with his former wife, Sara Beane, and which, therefore, required her approval. The couple has since divorced and the assets have been divvied up in their divorce proceeding. For purposes of this order, reference to Alan Beane guaranteeing loans or receiving security interests for the financing provided may include money that Sara Beane also provided and for which she also holds a security interest, and the two individuals are referred to jointly hereinafter as Alan Beane.

2

operating officer of the business.[3]  The pair initially formed a
company called Materials Innovation, Inc. (referred to
alternatively in the record as both "MII" and "Materials"), and
subsequently formed a second company, Mii Technologies, LLC
("Mii"), to finance the technological innovations of Materials
and provide Alan Beane tax benefits not available through
Materials' corporate structure.[4]  According to the complaint,
"Mii was formed . . . for the purpose of commercializing the
technologies created by both Materials and Mii, including
developing manufacturing systems and related software to produce
metal components, and funding future research and development by

_____

[3]At the beginning two other partners were involved to help
develop the company's powdered materials products; neither of
them is involved in the instant litigation.

[4]Both brothers were members and managers of Mii, and
together owned over 90% of the company; however, Alan Beane held
a majority interest in many of the assets, as security for the
financing he provided.  The brothers dispute the enforceability
of two documents that purportedly evidence some of the financing
provided:  the first, "the April Fool Note," was a promissory
note dated April 1, 2001, allegedly executed and backdated on
January 15, 2002, by which Mii purportedly agreed to repay
$1,500,000 on a revolving line of credit extended by Alan Beane;
the second, a "Commercial Security Agreement," ("Security
Agreement") executed on January 15, 2002, purported to secure
Alan Beane for that line of credit evidenced by the April 1, 2001
promissory note.  Glenn Beane contends the Security Agreement was
a sham, because Mii never drew down the line of credit; however,
Alan Beane asserted his rights under the Security Agreement to
take over the assets and operations of Mii.

3

Materials." <u>See</u> Am. Compl., ¶ 7 (document no. 14).  The two companies operated in tandem, until Materials dissolved in November 2003.

The interrelationship between the companies was evidenced by the "Research & Development Agreement and Related License" (the "R&D Agreement"), <u>see</u> Def.'s Ex. D to Hrg on Pet. to Attach ("Def.'s Ex."), which provided for Materials to license to Mii certain of its technology and patents, in exchange for Mii's agreement to "pay for all expenses related to the exploitation of those technology and patents, including (i) research, experimentation and development activities carried on in Materials Innovation's name, (ii) the creating of a powder metallurgy press, and (iii) the cost of leasing and improving the facility which Materials Innovation was to lease for Mii to use." Def.'s Counterclaims, ¶ 20(b) (document no. 24).  The two companies also shared a "Unified Pension Plan," which covered employees of both companies.  Both Alan and Glenn Beane were trustees of the plan.

Glenn Beane managed the daily operations of both Materials and Mii.  In that capacity, he developed manufacturing systems and related software known as the "press technology system," and

4

generated the intellectual property that constituted the core
assets of the business.  The press technology system that Glenn
Beane developed had "the ability to revolutionize the manufacture
of precision pressed metal parts and this ability resulted in
Time magazine recognizing Mii's powder pressing system as its
industrial invention of the year in 2000."  Am. Compl. ¶ 14.

Despite this technological success, Mii had great difficulty
marketing its press technology system.  By early 2002, Alan Beane
had substantially exhausted his personal assets financing
Materials and Mii, both of which also owed several creditors
significant amounts of money.  In January 2002, Alan Beane
decided to assert his rights as "debtor-in-possession" under the
challenged Security Agreement to assume more control over certain
intellectual property assets of the company.  The brothers also
decided to stop Materials' operations and shift all resources to
commercializing Mii's manufacturing systems.  As part of the
reallocation of resources, another brother, David Beane, came on
board to manage the company to allow Glenn Beane to concentrate
on further development of Mii's product.

Mii eventually secured a contract with Lovejoy, Inc. for a
1,000 ton, 8-level press system (the "Lovejoy contract").  As

part of the contract, Lovejoy agreed to be used as a reference
for how the system functioned in a commercial, production
environment.  The Beanes expected a successful Lovejoy contract
to catapult the business as "the supplier of the next generation
of press technology for the precision metal parts industry."  Am.
Compl. ¶ 29.  The Lovejoy contract, however, became the death
knell rather than the launching pad of Mii's business.

Mii was required to borrow more money to perform the Lovejoy
contract, which debt was secured by Mii's accounts receivable and
also subordinated the debt owed to Alan Beane.  Alan Beane,
however, guaranteed that loan.  Mii was delayed in executing the
contract, because, among other reasons, Lovejoy changed
specifications for the press system ordered.  In November 2003,
Mii finally delivered the 1,000-ton press to Lovejoy, with the
understanding that the requested upgrades would follow shortly.
From November 2003 through January 2004, Mii worked to complete
the designs for the Lovejoy upgrades and to obtain a bridge loan
to finance those upgrades and keep the business afloat.  The
bridge loan was obtained on January 7, 2004, but required Alan
Beane again to guarantee the debt and again to subordinate his
other secured notes.  In response, Alan Beane proposed conditions

6

to preserve his right to repayment, which Glenn Beane rejected. This stalemate caused Alan Beane to take control of the company's assets and operations as provided in the Security Agreement, which triggered Glenn Beane's resignation on February 4, 2004.

At this juncture, Alan Beane's path turned for the worse, while Glenn Beane managed to capitalize on the efforts invested in the business. Despite Alan Beane's efforts to fulfill the Lovejoy upgrades, he was unable to successfully complete the contract and lost a $200,000 deferred payment from Lovejoy as a result. In May 2004, he decided to end Mii's active operations, and, since then, has let the company idle. Immediately upon his departure from Mii, however, Glenn Beane formed a new company, based on the intellectual property rights he owned. He successfully secured new business, including customers he initially contacted while at Mii. In particular, Lovejoy hired Glenn Beane to complete its upgrade requests.

With Mii no longer operating, Alan Beane began to liquidate certain security interests to recover some of his investment. On March 3, 2005, he sold Mii's remaining manufacturing system assets to Lovejoy, for $550,000. A promissory note for $150,000 was executed as part of that sale, made payable to Alan Beane

7

personally.[5]  Glenn Beane was not given notice of the sale and,
therefore, did not give his approval of it.  In November 2006,
Alan Beane invoked the security agreement provision that allowed
him to assert any claim that Mii could assert, to bring this suit
against Glenn Beane, alleging he still owed certain duties to Mii
as one of its members, despite his February 2004 departure.

<u>Discussion</u>

**1.  Standard of Review**

Pre-judgment attachments are available to secure
satisfaction of judgments "under the circumstances and in the
manner provided by the law of the state where the district court
is held."  Fed. R. Civ. P. 64.  Under New Hampshire law, pre-
judgment attachments generally may only be issued after notice
and an opportunity to be heard have been given to the defendant.
<u>See</u> N.H. Rev. Stat. Ann. ("RSA") 511-A:1 and A:2.  At the
hearing:

> the burden shall be upon the plaintiff to
> show that there is a reasonable likelihood
> that the plaintiff will recover judgment . . .
> on any amount equal to or greater than the
> amount of the attachment.  Upon satisfying
> said burden, the plaintiff shall be entitled

---

[5]This note, together with the interest earned of $17,250, is
the asset Glenn Beane seeks to attach here.

> to the attachment unless the defendant establishes
> to the satisfaction of the court that his assets
> will be sufficient to satisfy such judgment . . ..

RSA 511-A:3.  The plaintiff's burden of proof to justify an

attachment is greater than the preponderance of evidence required

to prevail in a civil action.  See Diane Holly Corp. v. Bruno &

Stillman Yacht Co., 559 F. Supp. 559, 561 (D.N.H. 1983)

(explaining how New Hampshire's special constitutional protection

of property requires prejudgment attachments to be supported by a

strong preliminary showing of probable success).

"[M]ore than a favorable chance of success must be shown.. .

. [P]laintiff . . . must make a strong preliminary showing that

he or she will ultimately prevail on the merits and obtain

judgment in the requested amount and that this showing must be

established by proof greater than proof by a mere preponderance

of the evidence."  Id.  Only if plaintiff makes this higher

showing does the burden shift to defendant to demonstrate it has

the ability to satisfy the potential judgment against it.  See

id. (affirming order denying attachment without considering

defendant's ability to pay because plaintiff had not made the

requisite showing); see also RSA 511-A:3.

**2.  Plaintiff's Likelihood of Success**

In Count IV of his counter claim, Glenn Beane seeks reimbursement for the following expenditures he has made allegedly on behalf of the company, either as a guarantor of Materials and Mii, or as a derivative obligor of the companies. These include:

1.  $11,000 = to settle a suit with HOCO, LLC for unpaid rent of $54,088.31, plus interest, under a lease executed by Materials for premises where the operations of Materials, and later Mii, occurred; the lease was personally guaranteed by both Alan Beane and Glenn Beane;

2.  $27,000 = to settle a disputed balance as of July 16, 2004, due on a Citizens Bank credit card, issued to Materials and guaranteed by Glenn Beane for the business expenses of Materials, and later Mii; the charges were allegedly made to pay Mii employees' salaries during the time Alan Beane controlled Mii;

3.  $ 7,000 = to settle a suit brought by Terry Nason, a former employee of both Mii and Materials, to claim pension funds due under the unified Mii-Materials pension plan;

4.  $  550 = to vacate citations erroneously issued against Glenn Beane in two actions against Mii for wages, brought by former employees William Huebner and Christopher Hammer;

5.  $ 2,000 = for legal expenses incurred in

> responding to inquiries about the
> Materials-Mii unified pension plan
> from the plan's administrator, Summit
> Financial Corporation ("Summit") and
> from the U.S. Department of Labor; Alan
> Beane controlled the documents and
> information needed to comply with ERISA
> laws and make payments to Summit, but
> to date he has refused to provide the
> necessary information.
>
> 6. $150,000 = Glenn Beane's estimated anticipated
>      financial exposure as the trustee of the
>      Materials-Mii unified pension plan, if
>      not paid by the plan.  The plan has
>      sufficient assets.
> _____
> *  $197,550 = TOTAL of liabilities for which
>      Glenn Beane seeks reimbursement

Specifically, Glenn Beane contends that he "is entitled to

indemnification and other protection from claims which may

possibly be asserted against him in the future which are

derivative of Mii, Alan and/or Sara."  Def.'s Countercl., ¶ 56.

In his petition, however, Glenn Beane limited the attachment

sought as "only against Mii Technologies, LLC, not against Alan

Beane."  Counterplntf.'s Mem. in Support of Attach. Pet., ¶ B at

3 (document no. 41).  Accordingly, only the claims in Count IV

against Mii will be considered to determine whether the requested

attachment is appropriate.

     Under New Hampshire law, a right to indemnification may

arise either (1) as an express or implied duty under a contract, or (2) as a right derivative of or imputed by law.  See <u>Kantor v. Norwood Group</u>, 127 N.H. 831, 835, 508 A.2d 1078, 1081 (1986) (discussing right to indemnification for joint tortfeasors). Indemnification agreements are interpreted following the same rules as any other contract.  See <u>Gulf Ins. Co. v. AMSCO, Inc.</u>, 153 N.H. 28, 34, 889 A.2d 1040 (2005) (citing precedent).  The parties' intent is discerned from the express words of the contract, given their ordinary meaning.  <u>See</u> <u>id.</u>  Indemnity agreements will be construed narrowly and will rarely be implied. <u>See</u> <u>Dunn v. CLD Paving</u>, 140 N.H. 120, 122, 663 A.2d 104, 106 (1995) (citing precedent).  If, however, the right to indemnification is derivative or imputed by law, the court looks at whether the indemnitor is in fact liable, and whether the indemnitee paid to cover the indemnitor's matured obligation, to justify shifting liability to the indemnitor.  See <u>Hooksett Sch. Dist. v. W.R. Grace & Co.</u> 617 F. Supp. 126, 134 (D.N.H. 1984) (citing New Hampshire rule that the indemnitee's liability may be transferred to another);  <u>see</u> <u>also</u> <u>Morrissette v. Sears, Roebuck & Co.</u>, 114 N.H. 384, 387, 322 A.2d 7, 9 (1974) (explaining that a "right to '[i]ndemnity arises where one is legally required to

pay an obligation for which another is primarily liable'"
(internal quotation omitted)).

The petition to attach does not identify the source of Glenn
Beane's asserted right to indemnification.  He seems to argue
that the R&D Agreement, which provided for Mii to assume certain
financial obligations of Materials, may be extended to require
Mii to reimburse him for the company debts he has paid.  He seems
to further contend that Alan Beane, as the person in control of
Mii, has assumed Mii's purported obligation to indemnify Glenn
Beane for the company's debts he has covered.

The R&D Agreement, however, does not give rise to either an
explicit or implicit duty to indemnify Glenn Beane.  The express
language of the contract provides for Mii to assume certain
identified, financial obligations of Materials, in exchange for
Mii's use of Materials' intellectual property.  See Ex. D, §§ 2,
3 & 4, ¶¶ 3.1, 4.1 & 4.2.  The agreement is unambiguously between
the two companies, clearly stating the consideration exchanged
for the benefits received.  There is nothing in the R&D Agreement
that can be understood to relieve Glenn Beane of any obligations
he might have had to either Materials or Mii.  Except for a
provision regarding patent rights claims, see id., ¶ 7.2, the

agreement does not address any individuals or affect the rights or liabilities of the members, officers and managers of either Materials or Mii.  The agreement is strictly between Materials and Mii, and there is no justifiable reason to expand its scope to reach the financial obligations of either Glenn or Alan Beane. See Dunn, 140 N.H. at 122, 663 A.2d at 106 (requiring unambiguous contracts to be interpreted within the four corners of the document).

Glenn Beane, however, does have a right to reimbursement derived from New Hampshire statutory and common law.  Limited liability companies may indemnify any "member or manager or other person made a party to a proceeding or threatened to be made a named defendant . . . because such member . . . acted on behalf of the limited liability company, against liability for judgment [or] settlement . . .."  N.H. Rev. Stat. Ann. ("RSA") 304-C:9, I (2005).[6]  Although much of the debt Glenn Beane paid was in Materials', not Mii's, name, "the right to indemnity may arise

---

[6]Similarly corporations also may indemnify individuals who cover expenses on the company's behalf.  See RSA 293-A:8.52, 8.51-56 (1999).  While Glenn Beane cannot invoke these statutory provisions because Materials dissolved in November 2003, the statute reflects the legislature's endorsement of the policy considerations and equitable principles underlying the concept of indemnification.

where one is legally required to pay an obligation for which
another is primarily liable . . .." <u>William H. Field Co. v.
Nuroco Woodwork</u>, 115 N.H. 632, 634, 348 A.2d 716, 718 (1975)
(discussing when the right to indemnity arises in tort actions).

> "Where a surety makes a payment to a creditor
> and a cosurety has a defense against the
> creditor, the surety making the payment . . .
> (b) is entitled to contribution if he has become
> surety with the consent of the cosurety and if
> he made the payment . . . (ii) without knowledge
> of a defense in the justifiable belief that such
> a duty existed. . . ."

<u>Rice v. Snow</u>, 116 N.H. 69, 71–72, 352 A.2d 729, 730 (1976)
(quoting Restatement of Security § 152(b)(ii) (1941)).  Glenn
Beane alleges that he made the payments he did because he was
responsible, either as a guarantor of, signator on, or otherwise
derivatively responsible for, the outstanding indebtedness listed
in Count IV.

The evidence produced in support of Glenn Beane's petition
demonstrated the following:

<u>a.  The HOCO Lease</u>

The HOCO lease was executed by Materials, Inc. as lessee,
with both Alan Beane and Glenn Beane as guarantors.  <u>See</u> Ex. N.
Glenn Beane argues here that the R&D Agreement provision that Mii
"pay for . . . the cost of leasing and improving a facility which

15

[Materials] intends to lease and improve to house its research, experimentation and development efforts" entitles him to be reimbursed by Mii for the costs he incurred to settle the lease dispute.  The R&D Agreement, however, was executed on December 29, 1997, three and a half years after the HOCO lease was entered into on June 23, 1994.  The language refers to space which Materials "intends to lease and improve," not space that Materials had already leased at the time the agreement was executed.  The parties may have intended the R&D Agreement to cover the space described in the HOCO lease, but they also may have intended it to cover entirely different space; the language is neither specific nor definitive.

The evidence adduced at the hearing did not clarify whether Mii continued to operate out of the HOCO lease space and, therefore, assumed responsibility for the rent, or whether Mii worked from some other facility.  Glenn Beane testified simply to the fact that Mii was to reimburse Materials for the HOCO rent, without substantiating that claim with any documentary support other than the R&D Agreement, which does not clearly provide for HOCO lease payments.  Glenn Beane could have been reimbursed by Materials for its primary liability to HOCO which he paid;

16

however, he has not linked that liability to Mii sufficiently to reach its coffers for the indemnification he now seeks.  While the facts may prove that Mii moved into the HOCO space, or otherwise became liable for the rent due on the HOCO lease, the record currently before the court does not so clearly establish that obligation to satisfy the heightened burden of proof a plaintiff must carry to justify a prejudgment attachment under RSA 511–A:3.  See Diane Holly Corp., 559 F. Supp. at 561.

### b.  The Citizens Bank Credit Card

Glenn Beane next seeks reimbursement for the amount paid to settle a dispute with Citizens Bank for outstanding charges on a credit card, issued to Materials, which he personally guaranteed. The testimony adduced at the hearing demonstrated that the balance due was incurred to cover payroll expenses of Mii, for wages earned in the first half of 2004.  That testimony described the type of expense associated with "research, experimentation, and development activities" which Mii agreed to pay for when it executed the R&D Agreement with Materials, to justify ascribing this debt to Mii.  As a member of Mii, who paid for Mii's debt, Glenn Beane is entitled to seek indemnification for the expenses incurred.  See RSA 304–C:9, I.  Glenn Beane has carried his

burden of proof that he is likely to succeed on this claim to justify the attachment sought.

### c. The Nason Suit

The record demonstrates that both Glenn and Alan Beane, along with Materials and Mii, were sued by a former employee who sought unpaid wages after his January 22, 2002 termination, under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, et seq. ("ERISA"). See Def.'s Ex. W.  Glenn and Alan Beane were both trustees and plan administrators within the meaning of ERISA.  The parties reached a settlement, see Def.'s Ex. X, and the matter was dismissed with regard to Glenn Beane.  Because the record indicates this claim was against Mii and Materials, for which Mii would have assumed responsibility under the R&D Agreement, and that Glenn Beane covered, at least in part, expenses for which the company was primarily liable, he is likely to prevail on his claim for indemnification from Mii for the costs associated with settling this dispute.

### d. The Hubner and Hammer Actions

Glenn Beane next seeks reimbursement for costs associated with two lawsuits brought by former employees William Hubner and Christopher Hammer against Mii, to enforce wage claims awarded by

the New Hampshire Commissioner of Labor.  <u>See</u> Def.'s Exs. BB and

EE.  The New Hampshire Superior Court held Glenn Beane in

contempt for his failure to appear as a representative of Mii;

however, the matters against him were dismissed after the court

realized he had resigned from Mii on February 4, 2004 and,

therefore, could not represent the company.  <u>See</u> Def.'s Exs. DD &

GG.  This administrative error, however, cannot be attributed to

Mii.  Accordingly, Glenn Beane is not likely to succeed on his

claim for reimbursement of the expense incurred in resolving

these two matters.

> e.  The Pension Plan Claims

Glenn Beane's largest claim for reimbursement is related to

the company's pension plans, for which he remains liable as a

fiduciary under ERISA.  He contends that he has spent $2,000 to

answer questions from the United States Department of Labor and

Internal Revenue Service related to the company's pension plan,

and to resolve certain administrative charges and other expenses

related to the plan's administrator, Summit Financial Corporation

("Summit").  Glenn Beane also asserts a right to reimbursement of

$150,000, which he anticipates he will be required to pay to

satisfy potential claims from former employees.

Glenn Beane's claim for indemnification of the $2,000 he has spent to comply with both the government and Summit clearly represent liabilities for which Mii is primarily liable and which he, in his fiduciary capacity, was addressing to limit that liability.  He, therefore, is likely to succeed on his claim for reimbursement of that expense.

On the other hand, the potential liability that could arise from claims by former employees is too contingent to support any claim for indemnification.  See Jolicoeur v. Conrad, 106 N.H. 496, 498, 213 A.2d 912, 914 (1965) (barring recovery for future damages for  personal injuries that have not occurred); Hayes v. Morrison, 38 N.H. 90, 1859 WL 3721, *5 (1859) (disallowing claim for contribution to debt which is indefinite and contingent); see also Lennox v. Brady, 101 N.Y.S.2d 22, 24 (N.Y. Sup. Ct. 1950) (denying attachment of property not subject to judgment); 6 Am. Jur. 2d Attachment and Garnishment § 48 (1999) ("As a general rule, before a debt can be subject to garnishment, it must, at the time the writ is served, be existing, ascertainable, and not contingent upon other events.").

> It is elementary that no effective levy
> can be made merely upon a right based upon
> a contingency which may or may not happen
> in the future.. . . It is well settled

> that an indebtedness is not attachable
> unless it is absolutely payable at present,
> or in the future and not dependable upon
> any contingency.

Lennox, 101 N.Y.S.2d at 24 (quotation omitted).  Based on the

proffers made by both parties, the plan is adequately funded, and

Alan Beane maintains possession of and control over the pension

plan records.  If Alan Beane would cooperate with the government

and Summit to keep the plan in compliance with ERISA, the

anticipated liability may not become a reality; the debt is,

therefore, wholly contingent presently, and Glenn Beane's claimed

liability is merely speculative.  See 6 Am. Jur. 2, Garnishment

and Attachment § 48 ("A contingency in this sense refers to one

which controls the obligation to pay and not simply to the timing

or form of payment.").  He is not likely to succeed on his claim

in Count IV for reimbursement of the potential pension plan

claims, because he cannot be indemnified for an expense he has

not incurred or a liability he has not assumed.

Finally, Alan Beane makes two arguments in opposition to the

requested attachment.  First, Alan Beane contends that his

voluntary bankruptcy proceeding stayed any claims against his

estate, and that the relief from the stay Glenn Beane obtained

does not entitle him to the attach the promissory note from

Lovejoy.  <u>See</u> Pls.' Mem. in Support of Obj. to Def.'s Pet. to
Attach at 2-4 (discussing 11 U.S.C. § 362(a)(1) & (4) and citing
authority) (document no. 37-1).  Second, Alan Beane argues that
the current claim to the promissory note is barred by the statute
of limitations, because he assumed control over the property in
February 2004 and Glenn Beane did not assert his challenge to
that assumption of control until July 2007, which is beyond the
three year statute of limitations set forth in RSA 508:4 (1997).
Neither claim is persuasive, however, because the undisputed
evidence demonstrated that the promissory note Glenn Beane seeks
to attach is the property of Mii, not Alan Beane.  <u>See</u> Def.'s Ex.
I, bates page numbers 825, 845-46 (Mii's tax return showing
Lovejoy sale as income).[7]  Therefore, whether or not Alan Beane's
property is beyond Glenn Beane's reach is immaterial to the
attachment sought here, which is for Mii's property, not Alan
Beane's property.

---

[7]Counsel for Alan Beane proffered that an amended tax return
corrected that representation and demonstrated the promissory
note in fact belongs to him; however, neither the amended return,
nor any other evidence, was admitted at the hearing to support
that proffer.  I am bound to base my judgment on the record
before the court.

**2.   Defendant's Ability to Pay**

When, as is the case here, a plaintiff meets its burden of proving a likelihood of success on the merits to justify the prejudgment attachment sought, the burden shifts to defendant to demonstrate that it has sufficient assets to satisfy any potential judgment against it.  <u>See</u> RSA 511-A:3.  The record demonstrates that the proceeds from Mii's promissory note, totaling $167,250, are in an IOLTA trust account held by Alan Beane's attorneys.  <u>See</u> Pet. to Attach (document no. 33-3 and 33-4).  Glenn Beane has demonstrated he is likely to succeed on his claims for:

```
1)  Citizens Bank settlement     =  $27,000
2)  Nason Suit settlement        =  $ 7,000
3)  Pension plan legal expenses  =  $ 2,000

TOTAL                            =  $36,000.
```

Clearly the promissory note is more than adequate to cover the demonstrated claims against Mii.  There are at least two other claims, however, competing for that money:  Alan Beane asserts an ownership interest in it, having exercised his alleged rights under the Security Agreement; and counsel to Alan Beane are holding the funds in an IOLTA account, to cover the costs of legal fees he may incur.  Either or both of those interests could

dissipate the funds Glenn Beane seeks to secure by this petition to attach.  Because of the various adverse interests in the proceeds of the promissory note, Mii's ability to satisfy a judgment which Glenn Beane is likely to secure against it is tenuous.  Under the circumstances presented here, I find Mii does not have the ability to satisfy the potential judgment and conclude that the attachment should issue.

<u>Conclusion</u>

For the reasons set forth above, Glenn Beane's petition to attach (document no. 33) is granted in part and denied in part. An attachment in the amount of $36,000 shall issue against the proceeds from the Lovejoy promissory, currently being held in the IOLTA trust account of Lawson & Persson P.C., account number 24900683, at Meredith Village Savings Bank in Meredith, New Hampshire.

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge

Date: October 18, 2007

cc:  Michael J. Persson, Esq.
     Edward E. Lawson, Jr., Esq.
     W.E. Whittington, Esq.

24